Androscoggin Railroad Co. *v.* Auburn Bank.

----◆----

## ANDROSCOGGIN RAILROAD CO. *versus* AUBURN BANK.

*It seems,* if one pledges, as collateral, a demand on which interest is accruing at stated periods, some of which occur before his debt, so secured, becomes due, such pledge necessarily implies an authority to the pledgee, to collect and receive the interest as it becomes payable, and hold it, on the same terms as the demand itself; especially, if the collateral be a bond, with interest coupons attached, which the pledgor does not cut off, before the bond is pledged.

Where a railroad company pledged *its own bonds* as collateral for the payment of debts contracted by the company, and the pledgee cut therefrom and collected of the agents of the company the interest coupons that afterwards became due, such acts cannot operate as a conversion of the bonds by the pledgee.

REPORTED from *Nisi Prius* by GOODENOW, J.

TROVER, to recover certain railroad bonds. The most material facts, appearing from the report, are, in substance, that the plaintiffs hired of the defendants, on the 24th day of September, 1855, one thousand dollars, upon their promissory note, signed for them, by their treasurer, as principal, and by seven persons, as sureties. [From the testimony in the case, it appeared that the sureties were directors of the plaintiff corporation.] The plaintiffs pledged to the bank, as collateral security for the payment of the note, $2000, par value, in bonds of the plaintiff railroad company, with semi-annual interest coupons attached.

On the 15th of December following, the defendants discounted for the plaintiffs a similar note for $500, with $1000 in bonds, as collateral. And, on the 17th of January, 1856, a third note for $1000 was discounted, with $2000 in bonds as collateral for its payment.

These notes were renewed from time to time, the bonds and coupons remaining pledged for the security of each successive note.

On January 24th, 1857, the above notes were renewed by a similar note for $2800, on four months, and this was renewed May 23d, 1857, by a similar note for $3000, on six months, maturing November 14th, 1857, the bonds and coupons remaining pledged as collateral security for each successive note.

This last note remained overdue till December 28th, 1857, when it was renewed by two notes, each dated December 26th, 1857, payable in six months, one for $2000, and the other for $1000, both of a similar character to the one first described.

To secure these last two notes the aforesaid bonds and coupons of the plaintiff railroad company, amounting at par to $6000, were left pledged in the hands of the bank as collateral security for said notes. On a portion of the bonds, the coupons were payable on April 1, 1857, and thence semi-annually every six months; and on the remainder of the

Androscoggin Railroad Co. *v.* Auburn Bank.

bonds the coupons were payable June 1, 1857, and thence every six months.

All these coupons, except one, were attached to the bonds when first left by the plaintiffs, but such as had become payable, namely, two coupons from each bond, were cut off by defendants previous to October 12th, 1857, as hereafter stated.

The defendants cut off from the bonds whatever coupons were payable up to October 12th, 1857, and on that day sent them to the Merchants' Bank for collection, but they were not then paid, but were again presented January 15th, 1858, and they were then paid out of funds provided by the plaintiffs. The amount so received by the defendants, being $354, was retained by the bank, in the place of the surrendered coupons, to secure the payment of the notes, as stated by the officers of the bank, and no part of said notes has since been paid; and the whole amount, principal and interest, minus the said $354, received on said coupons as aforesaid, is still due and uncollected.

The plaintiffs placed in the Merchants' Bank, Portland, money for the payment of such coupons as were attached to bonds negotiated and were due. The defendants presented the coupons, cut off as above, at the Merchants' Bank and received the money from the officers of the bank, who delivered the coupons to the plaintiffs, in whose hands they have ever since remained.

Previous to such presentation and payment, notice had been published by plaintiffs—"that all overdue coupons of the mortgage bonds of the Androscoggin Rail Road Company, will be paid on the fifteenth day of January, 1858, at the Merchants' Bank in Portland."

Similar, and other bonds, had before this, been negotiated by the plaintiffs with other parties, and were absolutely held by such parties.

Before commencement of the suit, plaintiffs demanded of defendants payment of the bonds at $100 or par value, and offered to take the aforesaid notes in part payment therefor.

The depositions of several witnesses accompanied the report, as part of the case.

The Court to enter a nonsuit or default as the rights of the parties require.

The depositions in the case are somewhat voluminous. The bearing of the testimony on some points is indicated by the counsel in their arguments.

*Shepley & Dana*, for plaintiffs.

The bonds in controversy were pledged as collateral security for the payment of certain of the plaintiffs' notes, which the defendants held. They were signed by the directors, in their individual capacity, as sureties, with the express understanding, as stated by one of the witnesses, that the funds of the company were to take care of them. The sole interest of the sureties was, that the value of the collateral should not be diminished by the conduct of the bank.

The plaintiffs had actually sold and transferred other of their bonds, the interest on which they were to pay as it accrued.

Before they had raised the money for this purpose, the defendants, on or about October 12, 1857, cut off from the bonds lodged with them by the plaintiffs, as collateral to their six months note, dated May 23d, 1857, all the coupons due at that date, and presented them at a bank in Portland to be paid. The case shows that the note was not then due. Subsequently the note was renewed by two six months notes, dated Dec. 28, 1857; and, on the 14th January, 1858, before these notes matured, the defendants again presented the coupons at bank for collection, and, on the 15th, received the whole amount, viz., $354.

This severance and collection of these coupons was an unjustifiable act on the part of the defendants, and amounts to a conversion of the bonds, of which the defendants were mere bailees.

The law is well settled, that the bailee may only exercise any other acts than safe keeping of the thing pledged, where

the use of the thing may be necessary for the preservation of the deposit, or is authorized by the depositor. Story on Bailments, § 89.

It cannot be pretended here, that there was any previous authority given by the plaintiffs that the coupons should be collected, or any ratification of the act after it was done. The testimony of the president, who pledged the bonds, is explicit.

Defendants may claim that they were justified in presenting these coupons by the notice, because it includes " *all overdue coupons.*" The bonds had not been put in the market or sold. They, and the coupons annexed, were the property of the plaintiffs, and the coupons were no more overdue and payable by the company, in the sense of the notice, or in a legal sense, than those which remained in the treasurer's safe, awaiting a market.

The case does not come within the class in which the deposit will be diminished in value unless used; but it may be contended that there were two parties to the notes, the makers and the indorsers or sureties, and, that it was the duty of the bank to the sureties, to collect the interest on the deposit as it matured.

Under the facts in this case the position is wholly untenable.

The bailee has no right to do more than safely keep the pledge, *unless it is for the interest of the pledgor or his sureties, that the pledge be used.*

It will not be pretended that it was for the interest of the plantiffs that the coupons should be collected, for, if paid, it would be with plaintiffs' money. And the interest of the sureties was identical with that of the plaintiffs.

Until breach of condition, the bailee has no other right over a pledge of this nature than that of possession. Courts look with great jealousy on any exercise of dominion on the part of the bailee, who is not allowed to sell the pledge, *even after breach* of condition. The subject is much discussed in *Wheeler* v. *Newbold,* 5 Duer, 29, and 2 Smith, 392, where it

is held that, until after failure to perform the principal obligation, the bailee cannot collect the interest on the collateral.

In the case at bar the coupons were collected months before the notes were payable.

*C. W. Walton*, for the defendants.

The bonds were *pledged*, not *mortgaged*. The contract by which they were pledged was entirely silent as to the power of the pledgees over them. It laid no restrictions; imposed no terms. The law is to determine what rights were conferred, and what duties were imposed upon them.

From an examination of the authorities, it will be found, that it is not only the *right*, but the *duty* of holders of pledged bonds, notes and other like securities, to receive the money due upon them as fast as it becomes payable; and, if it is not paid voluntarily, to demand it.

This is precisely what the defendants, in this case, did; nothing more, nothing less. They demanded and received payment of the overdue coupons.

The plaintiffs contend that this was an unjustifiable act on the part of the defendants and amounted to a conversion, not only of the coupons collected, but of all the other coupons, and the bonds themselves; so that an action of trover can be maintained for them, notwithstanding the notes, to secure which they were pledged, have never been paid. The defendants, on the other hand, contend that, in all this, they have done no more than it was their right and duty to do.

It was their *right*, because their own security depended upon it. It was to the collateral alone they looked for safety against loss. The overdue coupons could then be collected, and a small amount thus realized from the collateral, while delay might occasion a loss of the whole.

It was their *duty*, because, having the possession and control of these securities, good faith to the owners, whoever they might be, and the sureties on the notes to secure which they were pledged, required the defendants to take care that no loss or depreciation in value should take place through

their negligence in not presenting them for payment at the proper time, and while payment could be obtained. If, through the lapse of time and the insolvency of the responsible parties, the coupons collected by defendants had been lost, would not the sureties have justly complained? Would they not have said to the defendants, "if you had presented these coupons for payment at the proper time, they would not have been lost; the loss is the result of your negligence, and you must bear it."

Generally, if not universally, it is so clearly for the advantage of the pledgor to have his securities collected for him by the pledgee, that few cases will be likely to arise where he will be the complaining party for such action on the part of the bailee. Take the case of a pledged note, payable on time, with a poor maker and a good indorser. Is it not the duty of the bailee to present the note for payment when it becomes due, and, if paid, receive the money, if not, notify the indorser? In fact, in all cases, where pledged securities are liable to become worthless or greatly depreciated in value from lapse of time, is it not the duty of the bailee to guard against such loss by the use of reasonable efforts to collect the money as fast as it becomes due?

It is certainly the right of debtors to pay their bonds, and other like securities, as fast as they become due. And if they are pledged, what is to be done? If the pledgee cannot rightfully receive the pay, how can payment be made? No one else can receive it, for that would defeat the purposes of the pledge.

In this case, the defendants did not sell the bonds or coupons. They only surrendered the overdue coupons to the plaintiffs or their agent, on the receipt of payment of the amount due upon them. And the plaintiffs themselves have ever since had possession of them. In doing this, the defendants violated no express agreement, for none was ever made. Certainly they were under no moral or equitable restraint, for their debt had been overdue and dishonored for nearly, if not quite, two years.

If, then, these defendants had a right, under the circumstances, to present these overdue interest coupons and receive the amount due upon them, it will require no additional argument to prove they had a right to surrender them to the plaintiffs, for such is the express stipulation in the bonds, that the interest will be paid on *surrender* of the coupons. If to surrender, of course they had a right to separate them from the bonds, for they could not otherwise be surrendered. In fact, *coupons*, as their name indicates, are made to be cut off.

To the point, that the bailees had the right to receive payment on the collateral, when the whole or a part of it becomes due before the principal, counsel cited and commented upon *Wheeler* v. *Newbold*, 2 Smith's N. Y. Rep., 392; *Russell* v. *Hester*, 10 Ala., 535, (7 U. S. Dig., 77, § 19); *Com. Bank of N. O.* v. *Martin*, 1 La. Ann. R., 344, (9 U. S. Dig., 62, § 24); *Chambersburg Ins. Co.* v. *Smith*, 11 Penn. State R., (1 Jones,) 120, (10 Dig., 58, § 14); *Lee* v. *Baldwin*, 10 Geo., 208, (13 Dig., 74, § 24); Am. Leading Cases, vol. 2, pp. 349, 350.

The opinion of the Court was drawn up by

DAVIS, J.— The plaintiffs hired money of the defendants, giving their promissory note therefor, and pledging, as collateral security, some of their bonds, with interest coupons attached. Their note was renewed from time to time, without payment of any part; and, some of the coupons upon the bonds becoming due in the mean time, the defendants presented them for payment, and received the amount due thereon. The plaintiffs claim that this was a conversion of the bonds; and they bring this action of trover for the value thereof.

If the question were really before us, we probably should come to the conclusion that a pledgee of credits, to secure a debt due from the pledgor to himself, might properly collect the accruing interest, even before his own demand is due, and hold the amount in pledge. Such an act has no analogy to the using of a chattel by the pledgee thereof. If one pledges as collateral, a demand on which interest is accruing at stated

periods, some of which occur before his debt, so secured, becomes due, such pledge necessarily implies an authority to the pledgee to collect and receive the interest as it becomes payable, and hold it on the same terms as the demand itself for the principal. Especially is this the case where the debtor pledges as collateral a bond, with interest coupons attached, which he might cut off before pledging the bond, but does not do it.

But the case at bar involves no such question. The plaintiffs pledged as collateral, not the bonds of third persons, but *their own bonds.* On these bonds, *they themselves*, by their agents, paid the accruing interest coupons to the defendants. That such payment, voluntarily made by themselves, with the knowledge, or the means of knowledge, in regard to the whole matter, operated as a conversion of the bonds by the defendants, is a proposition that requires no consideration.

*Plaintiffs nonsuit.*

TENNEY, C. J., APPLETON, CUTTING, MAY and GOODENOW, JJ., concurred.